In June 1998, the Mobile County Department of Human Resources ("DHR") received a report that S.D.W., who was three months old, had been admitted to the hospital with a skull fracture. According to the treating physician, the explanation of the cause of the fracture was not plausible, and the fracture was likely the result of physical abuse. While S.D.W. was hospitalized, W.M.B. ("the mother"), visited, bringing T.B., who was 16 months old, with her. The mother left both children unattended in the hospital room for three hours. DHR took custody of both children on June 19, 1998.
After S.D.W. and T.B. were placed in foster care in 1998, the mother began visiting the children. Although the mother visited fairly regularly for several months, the visits soon became sporadic. At times, the mother failed to visit because of her employment; at other times, she was living in Montgomery and did not have transportation to Mobile for visitation. At times the mother was difficult to reach because she had no telephone; often the mother either failed to return telephone calls or failed to leave messages for the caseworker because she did not like speaking on answering machines (she testified that she telephoned and spoke with the switchboard operator).
During 1999, the mother, who was 21 years old at the time of trial, received her GED certificate and completed two parenting classes as required by DHR. After she completed the second set of parenting classes in 1999, the instructor informed DHR that the mother was not ready to have her children returned to her care. DHR also required the mother to attend counseling for anger management, but the mother attended five counseling sessions and never completed that counseling; she testified at trial that the counselor had told her she did not need counseling. The mother was required to submit to random drug tests; of those she took, several came back positive for marijuana use. The mother refused transportation to take drug tests on certain dates in August 1999. Although DHR arranged for and made arrangements to pay for the mother's treatment in an inpatient drug-rehabilitation facility in both Mobile and Montgomery in May 2000, the mother never attended either program and tested positive for marijuana as late as July 2000. The mother testified at trial that she had not used marijuana since November 2000.
In July 1999, the mother gave birth to her third child, B.A.B., who was placed in foster care upon her release from the hospital. The mother had tested positive for marijuana use during her pregnancy with B.A.B. In addition, the mother tested positive for marijuana use twice during her pregnancy with her fourth child, K.B., who was born in late September 2000. K.B. was born with birth defects of the hand and feet.
In February 2000, T.W., the paternal aunt of S.D.W., requested and was granted custody of S.D.W. After disputes arose between the aunt and S.D.W.'s father, C.W., the aunt requested to be relieved of custody. S.D.W. was then returned to foster care in March 2000.
The mother's employment history is filled with short-term employment. She has had several jobs with fast-food restaurants and at one time held two jobs for only one week each. At trial, the mother testified that she was working at a Sonic restaurant near her home and that she had been employed there for almost two months. She further testified that she had worked at a Hardees' restaurant for six months before she started working at Sonic. The mother testified that she changed jobs often, because she looked for jobs *Page 49 
closer to her home as she had no access to transportation. Although the mother had earned her GED certificate, her testimony at trial indicated that she wished to study for and to retake the test so as to improve her score in order to pursue further education in the nursing field.
Likewise, the mother's residences have been varied. She has lived with her mother and stepfather in Mobile, with her mother in Montgomery, with friends, with a step-grandmother, and in her own apartment. At the time of the termination trial, she was again living with her mother in Mobile; she was seeking suitable housing.
The mother herself had been removed from the custody of her mother (the "maternal grandmother"). One of the mother's siblings was still in foster care at the time of trial. The maternal grandmother had 14 indicated abuse or neglect reports in her file. Accordingly, DHR did not believe that she was a suitable relative resource. In addition, DHR stated that the children could not be returned to the mother while she was living with the maternal grandmother.
The trial court terminated the mother's parental rights. She appeals.
The mother first argues that the trial court abused its discretion in terminating her parental rights. We disagree.
 "The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to the custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent's custody would be in the child's best interest, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to [Ala. Code 1975,] § 26-18-7(a). . . ."
Bowman v. State Dep't of Human Res., 534 So.2d 304, 305 (Ala.Civ.App. 1988) (citations omitted). The juvenile court's decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App. 1995).
To terminate parental rights, the juvenile court must first determine from clear and convincing evidence that the child is, or the children are, dependent. S.F. v. Department of Human Res., 680 So.2d 346
(Ala.Civ.App. 1996). The court must then determine that no alternative to termination exists. L.A.G. v State Dep't of Human Res., 681 So.2d 596
(Ala.Civ.App. 1996).
A court may terminate parental rights when "the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child . . . and such conduct or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a). Sections26-18-7(a)(1)-(6) and (b)(1)-(4) list factors the trial court must consider in making the difficult decision to terminate parental rights. Among those factors are that reasonable efforts at rehabilitation of the parent have failed, *Page 50 
§ 26-18-7(a)(6), and the lack of effort by the parent to adjust his or her circumstances to the needs of the child in accordance with agreements reached with case workers. § 26-18-7(b)(4).
We agree with the trial court that the mother has been unable to adjust her circumstances to meet the needs of her children. DHR provided numerous services to the mother, including transportation to visitation and drug testing, arranging for inpatient drug treatment, and educational support. In the early months, while the mother was receiving the aid of a family support worker, who assisted her with transportation and other services, she appeared to be making some progress. However, once that worker was removed, the mother's progress slowed. The mother argues that DHR could have assigned the mother another worker; however, although DHR did not assign another worker, it did continue to provide services, including transportation, to the mother and continued to work toward reunification.
The mother, who apparently misunderstood the seriousness of the situation, failed to show appropriate initiative. Although she knew that DHR was to arrange for payment for inpatient drug treatment for her in Montgomery, she simply failed to contact either DHR or the facility to determine whether those arrangements had been completed. She continued to use marijuana throughout the two years her children were in foster care pending reunification and during her two subsequent pregnancies. She did not make an effort to maintain stable employment or stable housing. She continued to rely in part on the support of the maternal grandmother, who herself had a poor history with DHR. She also failed to attend the final Individualized Service Plan ("ISP") meeting or the individual meeting the caseworker set up to discuss the ISP with her. In short, she failed to show that she could adjust her circumstances to meet the needs of her four children. Accordingly, the trial court's judgment terminating the parental rights of the mother is affirmed.
The mother's second argument on appeal is that the trial court erred by not appointing an attorney to represent C.W., the father of S.D.W. and T.B. The mother is precluded from raising on appeal issues affecting the rights of a nonappealing party. N.A. v. J.H., 571 So.2d 1130, 1132
(Ala.Civ.App. 1990) (citing McCulloch v. Department of Human Res.,536 So.2d 68 (Ala.Civ.App. 1988)).
AFFIRMED.
Yates, P.J., and Thompson, Pittman, and Murdock, JJ., concur.