PER CURIAM.
A.S., the mother, appeals from the judgment of the juvenile court terminating her parental rights.

Facts and Procedural History

The child who is the subject of these proceedings was born in 2007 while the mother was incarcerated following her convictions for first-degree theft of property, third-degree escape, second-degree forgery, first-degree receipt of stolen property, second-degree escape, and intimidating a witness. The charges arose out of a shoplifting incident at a department store. The child was placed with the child’s grandmother (the mother’s adoptive mother), who is also the child’s paternal great-aunt (the mother’s paternal aunt). In August 2008, the mother was released from prison and was placed on probation. In September 2008, the mother was arrested for harassment and third-degree theft of property arising out of an incident at a discount store. On September 12, 2008, the grandmother sought temporary custody of the child pending a hearing on the grandmother’s petition to seek permanent custody. The juvenile court granted the grandmother’s motion for temporary custody.
The mother served six months’ imprisonment on the harassment charge and was released in March 2009. The third-degree-theft-of-property charge was dismissed. In June 2009, the mother was arrested after being indicted on charges arising out of the shoplifting incident at the department store. A probation-revocation hearing was set.
On June 22, 2009, the juvenile court entered an order awarding the grandmother custody of the child. On July 16, 2009, the grandmother filed a petition to termi *1225 nate the mother’s parental rights.[1] In her petition, the grandmother alleged that the mother had failed to maintain consistent contact or communications with the child and had failed to provide support for the child and that there were no viable alternatives other than terminating the mother’s parental rights. The juvenile court set the grandmother’s petition for a hearing.
At the hearing on the petition seeking termination of the mother’s parental rights, the mother testified that she was at that time serving a 15-year prison sentence but that she was enrolled in a program in the prison for people with addictions and that if she successfully completed the program she would be released in six months. The mother explained that the program consisted of counseling five days a week for six months. She stated that she was a kleptomaniac and that the program was intended to treat her addiction to shoplifting. The mother testified that if she was not released early as a result of completing that program, then she would be eligible for an early release under a probation program where she would be released but continue counseling and check in on a daily basis. She testified that she would be able to obtain employment while on release as part of the probation program.
The mother testified at the hearing on the grandmother’s petition that she was then 26 years old and that she lived with the grandmother until she was 19. The mother testified that the grandmother adopted her when she was 12 and that the grandmother received funds from Social Security to aid in her support. While she was living with the grandmother, she became pregnant and had a child when she was 15 years old. The grandmother adopted that child, a boy. The mother testified that, at 15 years of age, she did not understand that by agreeing to the adoption she was voluntarily giving up her rights as a parent and that she lived in the house with the grandmother and that child for three years. The mother testified that the grandmother receives a Social Security benefit for the older child and that that was the reason the grandmother adopted her older child.
The mother testified that the child who is the subject of this petition was born while she was incarcerated. The mother stated that the child calls both the grandmother and the mother “mom.” She stated that she has a relationship with the child and that the grandmother allows her to talk with the child. She testified that she has given some money to the grandmother to support the child. The mother testified that the child would be provided for if the grandmother adopted the child and that the grandmother had promised her she would not stop the mother from seeing the child.
Upon questioning by the juvenile court, the mother testified that she was “okay” with the grandmother’s adopting the child but that she did not want her parental rights terminated.
“Q. [The juvenile court:] Let me make sure I understand something, Ms. S., because it is important.
“A. [The mother:] Yes, sir.
“Q. Is it your statement today that you’re okay with your grandmother who’s adopted you and so she’s now legally your mother, adopting [the child]?
“A. I have no problem with that.
*1226 “Q. Okay. You’re okay with her adopting. You understand that if she adopts [the child], then she’s [the child’s] mother? Do you understand that’s what adoption means? Or do you understand that?
“A. Would that be terminating my parental rights also, Your Honor?
“Q. Well, [the child] can’t have two mothers. Okay. So if you consent to an adoption, when the adoption order is signed, it’s not an order terminating your rights, but you no longer have the rights of a parent because you’re no longer the child’s mother. Do you understand? You’re her biological mother, that will never changed.
“A. Yes, sir.
“Q. But you’re not her mother at that point.
“A. Would that mean she would, like, have to keep my child away from me?
“Q. No. She doesn’t have to keep your child away from you. She could let you visit whenever she wants you to. She would be in charge, though. You wouldn’t have a right to say, I want to visit her. That’s the difference. Whether I terminate your parental rights so she can adopt; or you agree to the adoption and she adopts, either way she’s in charge and you don’t have a say so. Do you understand?
“A. (Nodding head affirmatively.)
“Q. Do you understand?
“A. Yes, sir.
“Q. Okay. So, in other words, it’s not a real difference. It’s just the way the legal procedure goes. Either with a court order from me, or with your consent. In the case with [your older child], you filed a consent.
“A. Right.
“Q. It’s the same — that amounts to the same thing as my order terminating your rights.
“A. Right.
“Q. That consent does what I do, except that you did it voluntarily. That’s why the lawyer asked you about, Did you do this voluntary?
“A. Well, I have....
“Q. At 15 you may not have understood unfortunately.
“A. Well, I have no problem with her, you know....
“Q. Okay. I just wanted to make sure I understood you. And to, a little bit, put on record what it means.”
The mother testified that she had served time in jail in Florida after being convicted of receiving stolen property and attempted escape. She stated that charges arising out of her theft at the department store in Alabama were pending at the same time as were the charges in Florida. The mother testified regarding an incident following a court hearing on custody of the child where the mother had the child with her and wanted to leave with the child and the mother’s father took the child from her. The mother testified that after that hearing the grandmother told her to leave her house.
The grandmother testified at the hearing that she was then 80 years old and that she had adopted the mother’s older child and that she had temporary custody of the younger child. She testified that she receives Social Security benefits for the older child and that she receives Temporary Assistance for Needy Families for the younger child. The grandmother testified that she wants the younger child to have a life with the older child and not to move around to different places. The grandmother testified that if the mother would “straighten up and be a mother,” she *1227 would like for the mother to take care of both of her children. The grandmother testified that she did not mind if the mother had visitation with the child if the mother would behave. She testified that while she was living with the grandmother and the child the mother would sometimes stay out late and did not help with the child.
“Q. [The juvenile court:] You have legal custody of [the child] right now; do you not?
“A. [The grandmother:] Yes, I do.
“Q. So why did you feel you need to adopt her?
“A. Because I wants to adopt her. I wants to adopt her like I did her brother.
“Q. Why?
“A. I just want [the younger child] to have a home like [the older child] has.
“Q. [The child] is 3 years old; is that correct?
“A. No. [The child is] 2.
“Q. She’ll be 3 in February, I’m sorry. Is that correct?
“A. Yes. Yes.
“Q. So when [the child] reaches 18, you’ll be 95 years old?
“A. I’m 80 now.
“Q. So you’ll be 95 when [the child is] 15?
“A. That’s right.
“Q. Do you think you can raise her to majority age?
“A. I done raised her this far. When the Lord see time for me to stop, He’ll take care of that.
“Q. What did you think will happen to [the child] then?
“A. I got daughters and sons that will take her. I have children that love [the child] like they love their own.
“Q. Okay. And [the child] has her mother also; does she not?
“A. Sure she have a mother and I’m not trying to take these children away from their mother. But their mother has got to straighten up and be a mother.
“Q. I understand. And the mother loves her children; does she not?
“A. I’m sure she do. I hope she do.
“Q. Okay. And if something were to happen to you and the mother was out of prison and doing well, would you want [the child] to go with the mother?
“A. I sure would. I would want both of them to go with her if she’s going to be a mother for them.”
At the end of the hearing on the grandmother’s termination petition, the juvenile court asked counsel for the mother to provide a copy of the mother’s records from the Alabama Department of Corrections regarding the mother’s sentence of incarceration, which counsel subsequently provided to the court. The sentencing information provided to the court indicated that the earliest possible release date for the mother is September 2011 and that her “long date” for release is December 2016. The mother has accrued time for good behavior while in prison.
On May 3, 2010, the juvenile court entered an order terminating the mother’s parental rights. The juvenile court found that the child was dependent and that the mother was incarcerated. The juvenile court found that it was in the best interest of the child that the mother’s parental rights be terminated to allow the custodial grandmother to adopt the child. The mother appealed.
The Court of Civil Appeals affirmed the judgment of the juvenile court, without an opinion. A.S. v. I.M.S. (No. 2090774, November 19, 2010), — So.3d - (Ala.Civ.App.2010) (table). The mother petitioned *1228 for, and this Court granted, certiorari review.

Standard of Review

In order to terminate an individual’s parental rights, the trial court must find by clear and convincing evidence that the child is dependent and that an alternative less drastic than the termination of parental rights is not available. § 12-15-319, Ala.Code 1975; Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). “The trial court’s decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong.” Ex parte State Dep’t of Human Res., 624 So.2d 589, 593 (Ala.1993). “This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility.” Ex parte Farm, 810 So.2d 631, 633 (Ala.2001). The party seeking to terminate parental rights, however, has the burden of presenting clear and convincing evidence showing that the parent whose rights are at stake is not capable of discharging, or is unwilling to discharge, his or her parental responsibilities and that no viable alternatives to terminating his or her parental rights exist. Ex parte Ogle, 516 So.2d 243, 247 (Ala.1987); see also K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003) (holding that the party seeking to terminate a parent’s rights bears the burden of proving that the termination of those rights is the appropriate remedy).

Analysis

The juvenile court specifically found that the child was dependent, based on the fact that the mother was incarcerated, although the juvenile court did not make a specific finding of fact regarding whether any viable alternatives to a termination of the mother’s parental rights existed. When a juvenile court has not made specific findings of fact in support of a judgment terminating parental rights, the appellate court must presume that the juvenile court made those findings necessary to support its judgment, provided those findings are supported by the evidence. D.M. v. Walker County Dep’t of Human Res., 919 So.2d 1197, 1210 (Ala.Civ.App.2005) (citing Ex parte Fann, 810 So.2d 631 (Ala.2001)).
When determining whether to terminate an individual’s parental rights, “the primary focus of a court ... is to protect the welfare of children and at the same time to protect the rights of their parents.” Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Therefore, “a court should terminate parental rights only in the most egregious of circumstances.” Id. Ex parte Beasley set out a two-pronged test that a court must apply in terminating an individual’s parental rights. First, unless the person petitioning for the termination of parental rights is a parent of the child, the court must make a “finding of dependency.” 564 So.2d at 954. In order to make a finding of dependency, the court must consider, among others, the factors found in § 12-15-319(a)(l)-(12), Ala.Code 1975. After making a finding of dependency, the court must ensure that “all viable alternatives to a termination of parental rights have been considered.” 564 So.2d at 954.
The mother does not dispute that the child is dependent because she is incarcerated. Section 12-15-319(a) sets out factors a court must consider before terminating parental rights and provides, in pertinent part:
“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the *1229 parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
In determining whether a parent is “unable or unwilling to discharge [her] responsibilities to and for the child,” the juvenile court must consider several factors, including “[c]onviction of and imprisonment for a felony.” § 12 — 15—819(a)(4).
In the present case, the mother argues that, although there was clear and convincing evidence of the child’s dependency, the grandmother failed to prove that no viable alternative to the termination of her parental rights existed under the circumstances. She argues that her condition is not “unlikely to change in the foreseeable future” because she will be eligible for probation in September 2011.
In Ex parte T.V., 971 So.2d 1 (Ala.2007), this Court reversed a judgment terminating a mother’s parental rights because the petitioner presented insufficient evidence to establish that no other viable alternative to termination of the mother’s parental rights existed. In T.V., the child was found to be dependent because the mother was addicted to drugs when the child was born, she rarely visited the child, and she had failed to support the child. Foster parents had raised the child, who was, at the time the petition was filed, four years old, and they had permanent legal custody of the child. The evidence before the trial court indicated that the mother had been drug-free for a year, that she had reconciled with her family and was raising her older child, and that she regularly attended church. This Court held that there was a viable alternative to termination of parental rights in that the foster parents could continue to have legal custody of the child and the mother could visit the child and establish a bond with the child.
In the present case, the grandmother has failed to present clear and convincing evidence that there is no less drastic measure than termination of the mother’s parental rights. The grandmother has sole custody of the child, and the mother’s visitation with the child is at the grandmother’s discretion. The grandmother testified that if the mother is behaving, then she wants the mother to have visitations with the child. The grandmother also testified that if something happened to her, she would want the mother to care for both of her biological children. The mother has shoplifting offenses and escape attempts on her record, but she has no convictions involving drugs or abuse. The harassment charge appears to have been filed by an employee of the discount store where the third-degree-theft charges arose who was familiar with the mother and who had had a long-term dispute with the mother. The mother has maintained limited contact with the child through telephone calls to the grandmother and has provided a small amount of support for the child. The evidence before the juvenile court indicated that the mother is in a treatment program in prison for her kleptomania and is apparently behaving while she is incarcerated because she has earned good-time credit. The mother is satisfied with the grandmother’s care of the child as evidenced by the mother’s testimony that she would not mind if the grandmother adopted the child but that she does not want her parental rights to the child terminated. The grandmother’s maintaining custody of the child and having the ability to determine and supervise the mother’s visitation "with the child is a viable alternative to termination of the mother’s parental rights while the *1230 mother is making progress towards rehabilitation. Thus, the juvenile court’s decision to terminate her parental rights appears to be premature.
“ ‘[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this] case[ ] “does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.” ’ ”
D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 445 (Ala.Civ.App.2003) (quoting V.M. v. State Dep’t of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998)).
We reverse the Court of Civil Appeals judgment affirming the juvenile court’s judgment terminating the mother’s parental rights, and we remand this case to the Court of Civil Appeals for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
WOODALL, BOLIN, PARKER, MURDOCK, SHAW, and MAIN, JJ., concur.
COBB, C.J., concurs in the result.
STUART and WISE, JJ., dissent.

. The grandmother’s petition also sought to terminate the parental rights of the putative father. He was served by publication and did not appear in court. His rights were terminated, and he is not a party to this appeal.