PER CURIAM.
On June 14, 2017, the Pike County Department of Human Resources ("DHR") filed four petitions in the Pike Juvenile Court ("the juvenile court") seeking to terminate the parental rights of K.J. ("the mother") to her four minor children. In those petitions, DHR also sought to terminate the parental rights of J.A.C., the father of two of the minor children, and to terminate the parental rights of the unknown father or fathers of the mother's other two minor children. The juvenile court conducted an ore tenus hearing over the course of two days--December 7 and December 14, 2017.
On January 3, 2018, the juvenile court entered four nearly identical judgments in which it made detailed findings of fact and ordered that the parents' parental rights be terminated. The mother timely appealed. This court has consolidated the appeals.
The record indicates that the mother has four children, who, at the time of the December 14, 2017, hearing on DHR's petitions to terminate parental rights, were 18, 17, 13, and 11 years old.[1] The children *1138 were taken into protective custody after DHR social workers were called to a local emergency room on September 7, 2015, to investigate possible physical abuse committed by the mother against two of her four children. DHR alleged that the mother had physically abused those children when she bit the younger child and the oldest child intervened to protect her sibling. The juvenile court entered a shelter-care order on September 8, 2015, and all four children have remained in foster care since that time.
The mother was charged with felony child abuse with regard to the incident that resulted in the two children being treated in the emergency room. She pleaded guilty to a misdemeanor charge of child abuse and received a sentence of four years' probation, and she remained on probation at the time of the termination hearing.
The mother denied any other, earlier instances of abuse of the children, and she denied that DHR had filed any petitions seeking custody of the children before the 2015 incident. While being questioned by the juvenile court, the mother insisted that this was the first time that DHR had been involved with the family with regard to allegations that she had abused the children. However, the 2015 incident was not the first allegation of child abuse leveled at the mother. The record indicates that the two older children were placed in foster care when they were younger because of an incident in which the oldest child's collarbone was broken; the mother denied that she had injured the child, but she later admitted that those two children had been in foster care for several months. In another incident, DHR investigated allegations that the mother had poured boiling water on the oldest child and had hit her with a broomstick; the mother denied those allegations and stated that she had accidentally spilled boiling water on the child. In response to questions about her disciplinary methods, the mother denied abusing the children, and she testified that she had only disciplined the two boys by hitting them with belts. The mother stated that the children had not suffered any major injuries from anything she had done to them.
When the four children were first placed in foster care in 2015, DHR offered the mother services, including parenting classes, a psychological evaluation and counseling, a drug-assessment and drug screening, domestic-violence classes, and anger-management classes. The mother completed the parenting classes in February 2016. The mother also participated in the psychological evaluation and the drug assessment. She did not complete the recommended outpatient drug classes, and, during the two years the children remained in foster care before the termination hearing, the mother submitted to drug screens only intermittently.
Ashley Parker, a DHR social worker assigned to the children's cases, testified that, before the termination-of-parental-rights actions were filed, DHR had requested that the mother submit to a total of 28 drug screens and that the mother had failed 13 of those screens and had failed to test 10 times; a failure to test is equivalent to a positive drug-screen result. Thus, the mother tested negative for the use of illegal drugs only five times before *1139 the termination-of-parental-rights actions were filed.
As a result of her child-abuse conviction, the mother agreed to attend "drug court." Roxanne Taylor, a monitoring specialist for the drug court, testified regarding the mother's drug screens for that program. Taylor stated that, between April 2016 and the termination hearing, the mother tested for the drug court and had 12 negative tests, 9 positive tests, and 5 "no shows." Taylor testified that the mother last tested positive for the use of marijuana on June 29, 2017, which was approximately two weeks after DHR filed its termination-of-parental-rights petitions. After DHR filed its June 2017 termination petitions, the mother submitted to seven more drug screens for DHR, and the results of each of those drug screens was negative for the use of illegal drugs.
The mother started the domestic-violence and anger-management classes in January 2016, and she was to attend those classes until the providers believed that she had made sufficient progress. The providers went to the mother's home to provide services, but, on several occasions, the mother was not at home and missed those appointments. Parker testified that the providers reported that the mother was often uncooperative and made it clear that she did not want to participate in those services. Parker testified that, despite being encouraged to participate in those services, the mother did not progress in the anger-management classes to a point at which the providers or DHR thought that she no longer needed those classes.
According to Parker, the mother began counseling sessions in January 2017, but she often did not attend those sessions. Parker also stated that she encouraged the mother to resume her participation in the anger-management and counseling sessions. Parker testified that the mother began participating more actively in counseling in June 2017, immediately after DHR filed its petitions seeking to terminate her parental rights.
Jessica Thomas, the mother's counselor, testified that the mother had progressed well in her counseling sessions. Thomas testified that the mother had consistently attended their monthly counseling sessions and that the only months that the mother did not attend counseling occurred when DHR failed to renew the referral for the mother to attend those counseling sessions. Thomas testified that the mother had made significant progress toward the goals Thomas had established for the counseling sessions; those goals included anger management and having plans for addressing difficult or stressful situations. Thomas stated that the mother regretted her actions (presumably the abuse of the children), that the mother was working to improve her impulse control, and that she believed that the mother could appropriately parent the children with the assistance of her extended family as a support system. We note that DHR questioned whether the mother had an appropriate family-support system. Thomas also stated that the mother had reported to her only one positive drug screen during the time she had counseled the mother, i.e., between January 2017 and the December 14, 2017, termination hearing. The juvenile court questioned Thomas regarding whether she would be surprised that the mother had had more than one positive drug screen and had failed to appear for other drug screens during that time, and Thomas indicated that she was unaware of those positive drug-screen results.
The mother disputed much of DHR's evidence indicating that she had failed to participate in services. The mother stated that the services provider who came to her house to address anger-management issues told her that she had done well and *1140 had completed those classes. The mother also testified that she had tried to participate in outpatient drug-treatment classes but that she had been removed from the program after she missed two classes due to illness. The mother testified that she informed her social worker of that circumstance but that the social worker never followed up with her to re-enroll her in those classes.
The mother claimed that she had missed many of her drug screens because of her work schedule. The mother admitted that she had continued to smoke marijuana until June 2017, when DHR filed its termination-of-parental-rights petitions. When asked why she had continued to use illegal drugs while her children were in foster care, the mother blamed the people with whom she was associating.
The children were placed together in a foster home located in another county. The mother was offered regular visitation with the children, but she claimed that a lack of a vehicle and other transportation issues prevented her from visiting the children regularly. The mother admitted that DHR had transported her to some of the initial visitations and that, in 2016, DHR had offered her gas vouchers to assist with the cost of traveling to visit the children. At the time of the termination hearing, the mother had not traveled to visit the children since May 2017, although she had visited with them at three court hearings conducted between May 2017 and the December 7, 2017, termination hearing. The mother testified, however, that she speaks to the children on the telephone frequently.
Four months before the termination hearing, the mother moved from her three-bedroom mobile home to a two-bedroom mobile home, which she acknowledged was not large enough if the children were returned to her home. The mother testified that she had not qualified for public housing because, she said, DHR refused to sign a statement saying that the children would return to her home. The mother testified that she moved because, she said, there had been break-ins in the neighborhood and the "the neighborhood in particular was just not my style of neighborhood to live in." However, she stated that the smaller mobile home was located across the street from the former one.
The mother became employed after the children were placed in foster care, and she had maintained consistent employment since that time. At the time of the December 14, 2017, termination hearing, the mother had been working full time at a fast-food restaurant for eight months. She stated that she also earned approximately $80 per week cleaning houses. Parker testified that DHR had filed a claim seeking child support from the mother but that a problem with the paperwork had prevented DHR from receiving that child support. It is not clear whether that problem with the paperwork occurred before or after a child-support order could have been entered, although DHR's brief submitted to this court indicates that no child-support order was entered.
In each of its termination judgments, the juvenile court made certain findings of fact and concluded, in pertinent part:
"Testimony was heard ore tenus regarding the petition, and the Court determined that the child was dependent and that the child's mother was unable or unwilling to discharge her responsibilities to and for the child.
"There was evidence that the child's mother had abandoned the child by withholding from the child, without good cause or excuse her protection, maintenance or the opportunity for the display of filial affection.
"....
*1141 "The mother has abused and cruelly beaten or otherwise maltreated the child and the child is in clear and present danger of being thus abused, cruelly beaten, or otherwise maltreated as evidenced by the treatment of a sibling. There is a long history of physical and emotional abuse by the mother against this child and [his or] her siblings.
"....
"The reasonable efforts of [DHR] leading toward rehabilitation of the mother, including referrals for anger management, parenting skills training, drug assessment, random drug screens, relative resource investigation, psychological evaluation, counseling, and case management services, have failed.
"....
"The mother has failed to provide for the material needs of the child or to pay a reasonable portion of the child's support when she was able to do so.
"The mother has failed to maintain regular visits with the child in accordance with a plan devised by [DHR] and agreed to by the parent.
"....
"There has been a lack of effort by the mother to adjust her circumstances to meet the needs of the child in accordance with agreements reached with [DHR]. While the mother has attended parenting classes and anger management counseling, the mother continues to minimize her abuse of the child and [his or] her siblings which has been going on for years. Her limited acceptance of responsibility is qualified by excuses and denials and appears to be focused on the return of her children to her custody and not on effecting real change in her thinking and behavior. She seems to have learned to say 'the right things' in order to satisfy the counselor. The evidence clearly and convincingly established that the return of this child to the custody of [his or] her parents would be contrary to [his or] her welfare and not in her best interests."
The attorney who represented the mother in the proceedings below was also appointed to represent the mother on appeal; that attorney is hereinafter referred to as "the previous attorney." The previous attorney submitted to this court a "no merit" brief pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and a motion to withdraw. In Anders, 386 U.S. at 744, 87 S.Ct. 1396, the United States Supreme Court held that if, after conscientiously reviewing the record, appointed appellate counsel in a criminal case found an appeal to be "wholly frivolous," the attorney could file a no-merit brief and a motion to withdraw from representation. In J.K. v. Lee County Department of Human Resources, 668 So.2d 813, 815 (Ala. Civ. App. 1995), this court held that court-appointed counsel in appeals in civil actions could follow the procedure set forth in Anders if he or she believed that an appeal of the civil judgment would be "wholly frivolous."
The previous attorney's brief filed on behalf of the mother in these appeals is illustrative of a number of problems in Anders briefs recently filed in this court. We take this opportunity to reiterate to the bar the requirements of Anders and J.K., supra, and to discuss when the filing of a brief pursuant to those authorities is appropriate.
In discussing the requirements of a no-merit brief, the United States Supreme Court explained:
"The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of amicus curiae. The no-merit letter and the procedure it triggers do not reach that *1142 dignity. Counsel should, and can with honor and without conflict, be of more assistance to his client and to the court. His role as advocate requires that he support his client's appeal to the best of his ability. Of course, if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court--not counsel--then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires. On the other hand, if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal."
Anders, 386 U.S. at 744, 87 S.Ct. 1396.
The United States Supreme Court has held that there is no right under the requirements of due process to appointed counsel in a termination-of-parental-rights action. Lassiter v. Department of Soc. Servs. of Durham, North Carolina, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). However, that court has recognized "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ). Alabama has created a right to counsel in actions seeking to terminate parental rights and in other cases in which a parent's child is alleged to be dependent. § 12-15-305(b), Ala. Code 1975; J.K. v. Lee Cty. Dep't of Human Res., supra ; and J.A.H. v. Calhoun Cty. Dep't of Human Res., 846 So. 2d 1093, 1095 (Ala. Civ. App. 2002) ("An indigent parent facing the termination of his parental rights is entitled to the appointment of counsel."). In doing so, Alabama has recognized that state action, such as the consideration of whether to terminate a parent's parental rights, is "in derogation of fundamental constitutional rights." In re Ward, 351 So. 2d 571, 573 (Ala. Civ. App. 1977). This court has explained:
"The legislature has thus by statute recognized that an action brought by the state which involves the termination of parental rights is of such importance that a parent must be informed of the right to counsel, and if indigent, must be furnished counsel. Such legislative and statutory recognition is in line with statements of the United States Supreme Court as to the fundamental nature of parental rights."
In re Ward, 351 So.2d at 573. See also K.P.B. v. D.C.A., 685 So.2d 750, 751 (Ala. Civ. App. 1996) (extending the right to appointed counsel in actions in which a child is alleged to be dependent to actions initiated by a parent seeking to terminate the rights of the other parent).
In J.K. v. Lee County Department of Human Resources, supra, after concluding that Anders should be applied to briefs filed by appointed counsel in civil cases, this court also addressed the requirements of a no-merit brief. This court noted that the appointed appellate counsel in that case had "filed a brief stating that after thoroughly reviewing the record he could find no reversible error and that he wished to withdraw" and that, "[i]n compliance with Anders, his brief raised issues that might give rise to a reversal." 668 So.2d at 816. Also, after counsel had complied with this court's order directing that the *1143 Anders brief be served on J.K., J.K. raised the issue of ineffective assistance of counsel, and counsel supplemented the original no-merit brief in order to address that issue. The appointed appellate counsel in that case determined that there was no error with regard to an alleged ineffective assistance of counsel. This court reviewed the record on appeal and agreed with the appointed appellate counsel's contention that there was no merit to the appeal. J.K., 668 So.2d at 816-17. Accordingly, this court affirmed the juvenile court's judgment in that case.
In her no-merit brief on behalf of the mother, the previous attorney included a one-sentence statement of the facts, stating: "Mother's parental rights were terminated on January 3, 2018, and Mother appealed the judge's rulings." The argument portion of the brief states: "After a conscientious examination of Mother's case, including a thorough reading and examination of the record, Appellate Counsel finds Mother's appeal to be without merit"; the brief then contains a short discussion of the requirements of Anders. In the no-merit brief, the previous attorney did not discuss any facts pertaining the cases for which she was appointed, and the "argument" portion of the brief she filed contained no references to any facts or issues, much less to "anything in the record that might arguably support the appeal." Anders, 386 U.S. at 744, 87 S.Ct. 1396. Thus, the brief the previous attorney served on the mother and submitted to this court is similar to the filing discussed in Anders, supra : it "affords neither the client nor the court any aid. The former must shift entirely for [her]self while the court has only the cold record which it must review without the help of an advocate." Anders, 386 U.S. at 745, 87 S.Ct. 1396.
The previous attorney served her motion to withdraw and the no-merit brief on the mother pursuant to the procedure set forth in Anders, supra, and J.K. v. Lee County Department of Human Resources, supra. On June 12, 2018, the previous attorney notified this court that she had received no response from the mother. Thereafter, this court reviewed the record on appeal and determined that, given the facts, the appeal was not "wholly frivolous." Accordingly, this court granted the previous attorney's motion to withdraw and ordered the juvenile court to appoint new appellate counsel to represent the mother on appeal. See Anders, 386 U.S. at 744, 87 S.Ct. 1396 ; Ex parte Pettibone, 891 So.2d 278, 280 n. 1 (Ala. 2003) ("When further appellate proceedings are required, then Anders mandates that new counsel must be appointed for an indigent defendant to argue the appeal for him."); and Graves v. State, 540 So.2d 97 (Ala. Crim. App. 1988) (when the appellant's original counsel failed to comply with the requirements of Anders, supra, the appellate court remanded for the appointment of new counsel).
An action involving a claim seeking to terminate parental rights affects both the fundamental rights of a parent and the well-being of the child at issue. The nature of a termination action involves allegations that a parent's inability to parent his or her child, that parent's failure to timely adjust his or her circumstances, and the lack of viable alternatives to termination, warrant the termination of the parent's fundamental right to parent his or her child. It is the duty of counsel to proceed as best he or she can to advocate on behalf of his or her client, even given a generally less-than-ideal fact situation.
In these cases, the previous attorney did not set forth a statement of facts or attempt to identify any arguable issue; her brief cannot be said to have complied with Anders or to have fulfilled her duty to her *1144 client, the mother. See Richardson v. State, 456 So.2d 1152, 1153 (Ala. Crim. App. 1984) (concluding that, by filing a one-sentence no-merit brief, the appointed counsel " 'did not fulfill his duty to be an active advocate on appeal' " (quoting Anders, 386 U.S. at 744, 87 S.Ct. 1396 ) ); see also Hill v. State, 51 Ala. App. 515, 518, 286 So.2d 924, 927 (1973) (commending appointed counsel for identifying possible issues and then conceding there was no merit to those arguments). The previous attorney's appellate brief made no attempt to assist this court in reviewing the record for possible error. The previous attorney's failure to comply with the requirements of Anders left the mother in the position of representing herself pro se. In addition, the previous attorney's appellate brief made no attempt to review the record for possible error, and, therefore, it deprived this court of the assistance of an advocate for the mother. See Anders, 386 U.S. at 745, 87 S.Ct. 1396. The United States Supreme Court stated that the requirements of Anders did
"not force appointed counsel to brief his case against his client but would merely afford the latter that advocacy which a nonindigent defendant is able to obtain. It would also induce the court to pursue all the more vigorously its own review because of the ready references not only to the record, but also to the legal authorities as furnished it by counsel."
Anders, 386 U.S. at 745, 87 S.Ct. 1396.
As indicated, in compliance with the order from this court, the juvenile court appointed new appellate counsel to represent the mother. This court directed newly appointed counsel to address the issue whether there were viable alternatives to termination, but we also specified that counsel was not limited to raising only that issue on appeal if he or she identified other issues that had possible merit. Newly appointed counsel has submitted a brief on behalf of the mother to this court.
"In order to terminate an individual's parental rights, the trial court must find by clear and convincing evidence that the child is dependent and that an alternative less drastic than the termination of parental rights is not available. § 12-15-319, Ala. Code 1975; Ex parte Beasley, 564 So. 2d 950, 952 (Ala. 1990). 'The trial court's decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong.' Ex parte State Dep't of Human Res., 624 So. 2d 589, 593 (Ala. 1993). 'This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility.' Ex parte Fann, 810 So. 2d 631, 633 (Ala. 2001). The party seeking to terminate parental rights, however, has the burden of presenting clear and convincing evidence showing that the parent whose rights are at stake is not capable of discharging, or is unwilling to discharge, his or her parental responsibilities and that no viable alternatives to terminating his or her parental rights exist. Ex parte Ogle, 516 So. 2d 243, 247 (Ala. 1987) ; see also K.W. v. J.G., 856 So. 2d 859, 874 (Ala. Civ. App. 2003) (holding that the party seeking to terminate a parent's rights bears the burden of proving that the termination of those rights is the appropriate remedy)."
Ex parte A.S., 73 So.3d 1223, 1228 (Ala. 2011).
On appeal, in the brief prepared by newly appointed counsel, the mother intermingles an argument that the juvenile court erred in determining that there were *1145 no viable alternatives to the termination of her parental rights with an argument that clear and convincing evidence did not support the decision to terminate her parental rights. The mother points out that she had regularly attended all of the counseling sessions for which DHR had paid, that she had maintained employment, and that she had stopped using illegal drugs when DHR filed its termination-of-parental-rights petitions. However, the record demonstrates that the mother began attempting to stop using illegal drugs in June 2017, only after DHR had filed its petitions; at that point, the children had been out of the mother's custody and in foster care for almost two years. Also, the evidence supports a conclusion that the mother had not made efforts to cooperate with the provider of anger-management classes and that those classes were needed to address the abusive conduct that had resulted in the children being placed in foster care.
In her appellate brief, the mother focuses on her recent abstinence from the use of illegal drugs to support her argument that the record does not support a determination that she could not properly parent the children in the foreseeable future. However, the language of the juvenile court's judgments, quoted above, indicates that the juvenile court found that the mother's efforts toward reunification were in the nature of last-minute efforts to prevent the termination of her parental rights, rather than an actual improvement in her circumstances. See A.M.F. v. Tuscaloosa Cty. Dep't of Human Res., 75 So.3d 1206, 1213 (Ala. Civ. App. 2011) ("[T]he juvenile court could have determined that, to the extent the mother may have allegedly improved her condition, those efforts were merely last-minute efforts undertaken in anticipation of the impending termination-of-parental-rights trial."). Although the mother testified that she could properly parent the children, there were several aspects of the mother's testimony that were contradictory and other aspects that could reasonably have led the juvenile court to question her credibility.
" 'The trial court's decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong.' Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala. 1993). That 'presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility.' Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001)."
A.K. v. Henry Cty. Dep't of Human Res., 84 So.3d 68, 69 (Ala. Civ. App. 2011). See also J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1185 (Ala. Civ. App. 2007) ("Because appellate courts do not weigh evidence, particularly when 'the assessment of the credibility of witnesses is involved,' ... we defer to the trial court's factual findings." (quoting Knight v. Beverly Health Care Bay Manor Health Care Ctr., 820 So.2d 92, 102 (Ala. 2001) ) ).
The mother has failed to demonstrate that the juvenile court erred in determining that grounds existed warranting the termination of her parental rights. In reaching that determination, we note that the mother did not challenge the juvenile court's finding that she had abandoned the children, and, therefore, this court may not address that issue. Normally, when a juvenile court determines that a parent has abandoned his or her children, the courts are not required to determine whether viable alternatives to termination existed. D.M. v. Jefferson Cty. Dep't of Human Res., 232 So.3d 237, 242 (Ala. Civ. App. 2017). However, given the posture of these appeals and this court's Anders order, we *1146 elect to address the issues as framed by the mother's newly appointed counsel.
It is well settled that " ' "DHR must present 'evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least drastic alternative.' " ' " J.F.S. v. Mobile Cty. Dep't of Human Res., 38 So.3d 75, 78 (Ala. Civ. App. 2009) (quoting C.T. v. Calhoun Cty. Dep't of Human Res., 8 So.3d 984, 987 (Ala. Civ. App. 2008), quoting in turn V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala. Civ. App. 1998), quoting in turn Bowman v. State Dep't of Human Res., 534 So.2d 304, 306 (Ala. Civ. App. 1988) ) (emphasis omitted). In asserting that the juvenile court erred in determining that there were no viable alternatives to termination, the mother first contends that DHR did not demonstrate that it had made reasonable efforts to locate the father of two of the children or relatives that the mother identified as being possible placements for the children. The mother appears to have provided DHR only with the names, but little to no contact information, of a number of her relatives. Parker testified regarding efforts she had made to locate relatives for whom the mother provided no contact information. Parker testified that those relatives whom she was able to locate were unable or unwilling to serve as a placement for the children.
In addition, the mother told DHR social workers that she was not certain of the name of the father of two of the children but that she thought it might be "M.S." "M.S." is a common name. Parker testified that she sent letters to 30 men with that name, and the few men with that name who responded were not the man for whom DHR was searching as the possible father of two of the mother's children.
The mother also alleges in her brief on appeal that, in attempting to locate relative resources, "DHR uses 18th century technology of pen and paper with a private database." To the extent that the mother appears to be arguing that DHR does not use a computerized state-wide database, the record refutes that allegation, as does the mother's own argument in her brief submitted to this court. The mother contends that rather than using its electronic database, known as "Accurint," DHR should have investigated the whereabouts of the relatives she named, but for whom she provided no contact information, using the electronic database utilized by the State's Department of Motor Vehicles or by a law-enforcement agency. The mother presented no evidence, however, indicating that the Accurint database is not the same database used by those entities or that any other database could provide more accurate information than the one used by DHR. We cannot say that the mother has demonstrated error with regard to her argument that DHR's efforts to locate "M.S." or her relatives to inquire as to their willingness or appropriateness to serve as a placement for the children were insufficient.
The mother also contends that a viable alternative to termination was to maintain the status quo, i.e., to allow the children to remain in foster care for some indefinite period in the hope that she would improve her circumstances sufficiently to reunite with them. In Ex parte A.S., 73 So.3d at 1228, our supreme court held that a viable alternative to termination of a mother's parental rights was to maintain the status quo. In that case, the child's grandmother had sole custody of the child and the mother visited with the child at the grandmother's discretion. The grandmother petitioned to terminate the mother's parental rights, and the juvenile court granted that petition. The mother argued that leaving the child in the custody of the grandmother was a viable alternative *1147 to the termination of her parental rights. In that case, the mother was in prison, but she had maintained contact with the child, was seeking treatment for the kleptomania that had led to her incarceration, and had earned "good-time credit" toward her release date. Our supreme court concluded that, given the facts of that case,
"[t]he grandmother's maintaining custody of the child and having the ability to determine and supervise the mother's visitation with the child is a viable alternative to termination of the mother's parental rights while the mother is making progress towards rehabilitation. Thus, the juvenile court's decision to terminate her parental rights appears to be premature."
Ex parte A.S., 73 So.3d at 1229-30.
In her brief in these appeals, the mother relies on A.H. v. Houston County Department of Human Resources, 122 So.3d 846 (Ala. Civ. App. 2013), which cites Ex parte A.S., supra. In A.H., supra, the mother had passed all of her drug screens except for one she could not take because she was on house arrest. In addition, she had obtained stable housing and had regularly visited the children. This court reversed a judgment terminating the mother's parental rights, concluding that, "[b]ased on the evidence in the record before this court regarding the mother's current conditions, we cannot agree that termination of the mother's parental rights is warranted at this time because maintaining the status quo is a viable alternative to termination under the specific facts presented in this case." A.H. v. Houston Cty. Dep't of Human Res., 122 So.3d at 852.
In these cases, however, between the time DHR filed its petitions and the date of the hearing on the merits, the mother moved to a smaller, two-bedroom residence. Also, the mother did not complete drug-treatment classes, and she consistently had positive drug screens or failed to appear for drug screens. The mother last tested positive for illegal drugs on June 27, 2017, shortly after DHR filed its termination petitions. In the almost two years the children had been in foster care before the termination-of-parental-rights petitions were filed, the mother made little progress toward the reunification goals in order to regain custody of the children. Accordingly, given the findings of fact in the juvenile court's judgments, and with the applicable presumption of correctness afforded judgments based on ore tenus evidence, we cannot say that the juvenile court erred in rejecting as a viable alternative to termination leaving the children in foster care for an indeterminate amount of time until the mother might make sufficient progress toward reunification. The mother has not demonstrated that the juvenile court erred in determining that there were no viable alternatives to the termination of her parental rights.
Accordingly, for the reasons stated in this opinion, the juvenile court's judgments terminating the mother's parental rights to the children are affirmed.
2170409-AFFIRMED.
2170410-AFFIRMED.
2170411-AFFIRMED.
2170412-AFFIRMED.
Thompson, P.J., and Pittman, Thomas, and Donaldson, JJ., concur.
Moore, J., concurs in the result, without writing.

The age of majority in Alabama is 19 years. § 26-1-1, Ala. Code 1975. The fact that the oldest child (A.C.) reached the age of majority during the pendency of these appeals does not moot the issue of the correctness of the juvenile court's judgment terminating the mother's parental rights to that child. This court has held that we need not address the correctness of a custody judgment when the child at issue reaches the age of majority during the pendency of the appeal of the custody judgment. Hadley v. Hadley, 202 So.3d 699, 703 (Ala. Civ. App. 2016) ; Faust v. Knowles, 96 So.3d 829, 832 (Ala. Civ. App. 2012). However, because the termination of parental rights affects other issues, such as rights of inheritance, we address the arguments the mother has asserted on appeal as they pertain to all four of the children at issue.